Ashwin J. Ram (SBN: 277513)
aram@steptoe.com
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071

Andrew C. Adams (admitted *pro hac vice*)
acadams@steptoe.com
1114 6th Ave.
New York, NY 10036

Nicholas P. Silverman (admitted *pro hac vice*)
nsilverman@steptoe.com
Galen C. Kast (admitted *pro hac vice*)
gkast@steptoe.com
1330 Connecticut Ave. NW
Washington, DC 20036
+1 213 439 9400
**Steptoe LLP**

Darrell P. White (SBN: 270038)
dwhite@klw-law.com
17631 Fitch
Irvine, CA 92614
+1 949 474 0940
**Kimura London & White LLP**

*Attorneys for Defendant Roger Keith Ver*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:24-cr-00103-MWF |
| Plaintiff, | **DEFENDANT ROGER K. VER'S REPLY IN SUPPORT OF MOTION TO DISMISS COUNTS ONE THROUGH EIGHT OF THE INDICTMENT** |
| vs. | |
| ROGER K. VER, | |
| Defendant. | Judge: Hon. Michael W. Fitzgerald<br>Hearing Date: February 10, 2025<br>Time: 1:30 pm<br>Date Filed: January 27, 2025 |

# TABLE OF CONTENTS

I.    Introduction ...................................................................................................1

II.   The Court Should Dismiss The Indictment .................................................2

    A.  The Exit Tax Exceeds Congressional Authority and Unconstitutionally
        Penalizes a Fundamental Right .................................................................2

      1.  The Exit Tax Is an Unconstitutional Direct Tax on Wealth ................2

          a.  Expatriation Is Not a Taxable Activity .............................................3

          b.  Expatriation Does Not Involve a Transfer of Property ....................5

          c.  The Exit Tax Is Not an Income Tax ..................................................6

      2.  The Exit Tax Is an Unconstitutional Burden on the Fundamental Right
          to Expatriate .........................................................................................8

          a.  The Exit Tax Burdens the Right to Expatriate .................................8

          b.  The Right to Expatriate Is Fundamental ..........................................9

          c.  The Exit Tax Does Not Withstand Any Level of Scrutiny .............11

    B.  The Indictment Rests on Impermissibly Vague Legal Foundations..........12

    C.  The Government's Selective Quotation and Disregard of Exculpatory
        Evidence Warrants Dismissal ..................................................................16

      1.  The Exhibits Underlying the Indictment Were Exculpatory ..............16

      2.  The Government Was Not Entitled to Mislead the Grand Jury
          Regarding the Exhibits' Content .........................................................19

III.  Ver Is Neither a Fugitive Nor Subject to Disentitlement ...........................21

    A.  Ver Is Not a Fugitive.................................................................................21

    B.  Even If Ver Is a Fugitive, Disentitlement Is Unjustified ...........................24

# TABLE OF AUTHORTIES

**Page(s)**

**Cases**

*Alsberry v. Hawkins*,
  39 Ky. 177 (1839) ...................................................................................10

*Antonio–Martinez v. INS*,
  317 F.3d 1089 (9th Cir. 2003) ...............................................................22

*Aroeste v. United States*,
  2023 WL 8103149 (S.D. Cal. 2023)........................................................14

*Ex parte Bain*,
  121 U.S. 1 (1887)....................................................................................20

*Brar v. Holder*,
  336 F. App'x 631 (9th Cir. 2009)......................................................22, 23

*Brushaber v. Union Pac. R. Co.*,
  240 U.S. 1 (1916)...........................................................................2, 4, 11

*Cohens v. Virginia*,
  19 U.S. 264 (1821).....................................................................................7

*Cottage Saving Ass'n v. Comm'r*,
  499 U.S. 554 (1991)...................................................................................5

*In re Cylink Sec. Litig.*,
  178 F. Supp. 2d 1077 (N.D. Cal. 2001)..................................................18

*Diedrich v. Comm'r*,
  457 U.S. 191 (1982)...................................................................................7

*Flint v. Stone Tracy Co.*
  220 U.S. 107 (1911)..........................................................................3, 4, 7

*Gutierrez v. I.N.S.*,
  201 F.3d 444 (9th Cir. 1999) ...................................................................23

*Helvering v. Griffiths*,
  318 U.S. 371 (1943)...................................................................................7

ii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*In re Hijazi*,
   589 F.3d 401 (7th Cir. 2009) ...................................................................23, 24

*Hylton v. United States*,
   3 U.S. 171 (1796) ...........................................................................................4

*Kawashima v. Holder*,
   565 U.S. 478 (2012) ......................................................................................14

*Knowlton v. Moore*,
   178 U.S. 41 (1900) .....................................................................................2, 4

*Kolender v. Lawson*,
   461 U.S. 352 (1983) ......................................................................................16

*McFadden v. United States*,
   576 U.S. 186 (2015) ................................................................................15, 16

*Moore v. United States*,
   602 U.S. 572 (2024) ................................................................................3, 6, 7

*Murphy v. United States*,
   992 F.2d 929 (9th Cir. 1993) .........................................................................7

*Murray v. McCarty*,
   16 Va. 393 (1811) .........................................................................................10

*Murray v. Schooner Charming Betsy*,
   6 U.S. 64 (1804) ............................................................................................10

*NFIB v. Sebelius*,
   567 U.S. 519 (2012) .....................................................................................2, 4

*Palko v. Connecticut*,
   302 U.S. 319 (1937) ......................................................................................11

*Patton v. Brady*,
   184 U.S. 608 (1902) ........................................................................................4

*Pollock v. Farmers' Loan & Trust Co.*,
   157 U.S. 429 (1895) ........................................................................................2

iii

*Pollock v. Farmers' Loan & Trust Co.*,
    158 U.S. 601 (1895).................................................................4

*Richards v. Sec'y of State*,
    752 F.2d 1413 (9th Cir. 1985) ...........................................10

*Savorgnan v. United States*,
    338 U.S. 491 (1950)...........................................................10

*Screws v. United States*,
    325 U.S. 91 (1945).............................................................16

*Speiser v. Randall*,
    357 U.S. 513 (1958)...........................................................11

*Stirone v. United States*,
    361 U.S. 212 (1960)...........................................................20

*Talbot v. Jansen*,
    3 U.S. 133 (1795) (Iredell, J.) .........................................10

*Thomas v. United States*,
    192 U.S. 363, 371 (1904)...................................................3

*United States v. $671,160.00 in U.S. Currency*,
    730 F.3d 1051 (9th Cir. 2013) ....................................23, 24

*United States v. Al Mudarris*,
    695 F.2d 1182 (9th Cir. 1983) ...........................................20

*United States v. Barnette*,
    129 F.3d 1179 (11th Cir. 1997) .........................................23

*United States v. Bescond*,
    24 F.4th 759 (2d Cir. 2021) ......................................*passim*

*United States v. Boyle*,
    469 U.S. 241 (1985)...........................................................19

*United States v. Cartwright*,
    411 U.S. 546 (1973)...........................................................17

iv

*United States v. Cornelson*,
   595 F. Supp. 3d 265 (S.D.N.Y. 2022) .................................................. 24

*United States v. Davis*,
   588 U.S. 445 (2019) ............................................................................. 16

*United States v. Fisher*,
   607 F. App'x 645 (9th Cir. 2015) .................................................. 14, 15

*United States v. Jinian*,
   725 F.3d 954 (9th Cir. 2013) ............................................................... 15

*United States v. Martirossian*,
   917 F.3d 883 (6th Cir. 2019) ......................................................... 22, 23

*United States v. Mfrs. Nat. Bank of Detroit*,
   363 U.S. 194 (1960) ............................................................................... 4

*United States v. Red Elk*
   955 F. Supp. 1170, 1182 (D.S.D.1997) ............................................... 20

*United States v. Samango*,
   607 F.2d 877 (9th Cir. 1979) ......................................................... 20, 21

*United States v. Shalhoub*,
   855 F.3d 1255 (11th Cir. 2017) ........................................................... 23

*United States v. Siriwan*,
   2011 WL 13057709 (C.D. Cal. July 28, 2011).............................. 23, 24

*United States v. Tucor Int'l, Inc.*,
   35 F. Supp. 2d 1172 (N.D. Cal. 1998), *aff'd*, 189 F.3d 834
   (9th Cir. 1999).................................................................................... 22

*United States v. Wong Kim Ark*,
   169 U.S. 649 (1898) ............................................................................... 9

*Wenqin Sun v. Mukasey*,
   555 F.3d 802 (9th Cir. 2009) ............................................................... 22

*Wood v. Georgia*,
   370 U.S. 375 (1962) ............................................................................. 20

v

1

**Statutes**

26 U.S.C. § 467 ................................................................................7

26 U.S.C. § 475 ................................................................................7

26 U.S.C. § 817A ..............................................................................7

26 U.S.C. § 877 .........................................................................11, 12

26 U.S.C. § 877A ..........................................................................8, 17

26 U.S.C. § 1256 ..............................................................................7

26 U.S.C. § 1259 ..............................................................................7

26 U.S.C. § 1272 ..............................................................................7

26 U.S.C. § 1296 ..............................................................................7

28 U.S.C. § 2466 .............................................................................23

**Other Authorities**

Alex Zhang, *Rethinking Eisner v. Macomber*, 92 G.W. L. Rev. 179
   (2024) ........................................................................................7

Form 8854, *available at* https://www.irs.gov/pub/irs-pdf/f8854.pdf
   (last visited Jan. 27, 2025) .......................................................14

J. Comm. on  Taxation, *Issues Presented by Proposals to Modify the
   Tax Treatment of Expatriation* 84 (June 1, 1995) ..................12

James H. Kettner, *The Development of American Citizenship* 1608-
   1870 (1978) ..............................................................................10

Opinion of Attorney Gen. Black, 9 U.S. Op. Atty. Gen. 356, 358 (July
   4, 1859) ....................................................................................10

Opinion of Attorney Gen. Cushing, 8 U.S. Op. Atty. Gen. 139 (Oct.
   31, 1856) ...............................................................................9, 10

## I.    INTRODUCTION

The government kicks off its opposition by begging this Court to ignore the substantive defects in its prosecution and focus on procedure—falsely claiming that Roger Ver is a "fugitive from justice" who should be "disentitled" from asserting his fundamental rights as a criminal defendant. This stratagem is unsurprising given the government's inability to defend its defective legal theories or its consistent burying of exculpatory facts. Ultimately, however, the government's arguments fail, both as a matter of procedure and substance. This Court should not allow the government to leverage a fatally flawed indictment to exert pressure on Ver through the threat of extradition.

On the threshold procedural question, the fugitive disentitlement doctrine is inapposite. A fugitive is one who either flees the jurisdiction or hides himself away to avoid prosecution. Ver has done neither: he is a foreign national who has lived outside the United States since long before the alleged crimes occurred, and he has never fled or hidden—to the contrary, he has lived and worked openly. The government's argument is simply that, when it chose to have him arrested in Spain, Ver stood on his legal right to oppose extradition rather than forfeit that right in favor of the Orwellian "duty to report for prosecution" that the government posits. But that supposed "duty" rests on an unreasoned ruling of the Sixth Circuit, has been rightly rejected by the Second Circuit, and is inconsistent with the law of this Circuit. This Court should reject it too. And even if Ver were a fugitive, the purposes of the disentitlement doctrine counsel *against* its application in this case.

On the merits, the government fails to answer Ver's arguments or resuscitate the indictment. The exit tax is an unconstitutional wealth tax targeting the fundamental right to expatriate; the tax treatment of bitcoin was so unconstitutionally vague in 2014 that, over a decade later, even the government is unable to correctly cite a regulation or rule that contradicted Ver's good faith efforts to comply with U.S. law; and the government hoodwinked the grand jury with a

---

1

deceptive account of the underlying documents and events that pervade the indictment itself. The Court should dismiss the indictment.

## II.    THE COURT SHOULD DISMISS THE INDICTMENT

### A.    The Exit Tax Exceeds Congressional Authority and Unconstitutionally Penalizes a Fundamental Right

#### 1.    The Exit Tax Is an Unconstitutional Direct Tax on Wealth

The exit tax does not tax income. Nor does it tax any form of economic activity, transaction, or transfer. It is a direct tax on personal property—a "wealth tax"—imposed directly on the value of that property, purely as a consequence of who owns it. It makes no difference that the IRS has tied the *imposition* of that tax to a triggering event—expatriation—because the event in question is personal, not economic or commercial, and has no nexus to the taxed property. If the exit tax were deemed constitutional, the IRS could invent any number of "triggering" events in order to single out targets of a wealth tax (perhaps "flying first class" or "obtaining cryptocurrency"), and the Court must condemn that unconstitutional overreach.

A direct tax is one "levied directly on property because of its ownership." *Brushaber v. Union Pac. R. Co.*, 240 U.S. 1, 14 (1916). In the seminal case on direct and indirect taxes, the Supreme Court explained that the direct tax "classification … was adopted for the purpose of rendering it impossible to burden by taxation *accumulations* of property, real or personal, except subject to the regulation of apportionment." *Id.* at 16 (discussing *Pollock v. Farmers' Loan & Tr. Co.*, 157 U.S. 429, 581 (1895)) (emphasis added). The Constitution imposed this apportionment requirement "to prevent taxes on persons solely because of their general ownership of property." *Knowlton v. Moore*, 178 U.S. 41, 82 (1900); *accord NFIB v. Sebelius,* 567 U.S. 519, 571 (2012) ("[W]e continue[] to consider taxes on personal property to be direct taxes"). Such a "general ownership of property" tax does not become constitutional simply because it is tied to a subset of the population, *i.e.*, citizens seeking expatriation. Indeed, the Constitution prohibits such targeting.

Resisting this commonsense outcome, the government struggles to frame the exit tax as anything other than what it plainly was: a tax on Ver's property. The government's arguments fail.

### a.    Expatriation Is Not a Taxable Activity

The government quotes dicta from *Moore v. United States*, 602 U.S. 572 (2024) for the proposition that indirect taxes may be imposed on "activities or transactions." Gov't Opp. to Mot. to Dismiss 16, Dkt. 34 ("Opp."). But the Supreme Court never meant to suggest that a tax laid on the "fair market value" of all of one's property—the archetypal direct tax—somehow becomes an indirect tax simply because the tax is triggered by some personal activity unrelated to the property. Far from being a legitimate indirect tax, a wealth tax exacting 50% of the property of any person who sneezes, practices judo, or espouses libertarian views would be a classic *direct* tax. The Apportionment Clause would mean nothing at all (and certainly would not have required enacting the Sixteenth Amendment) if Congress could circumvent it so easily at the expense of unpopular groups.

Unsurprisingly, the government's cited cases upheld taxes on economic dealings where the amount of the tax was linked to the economic dealing in question, not to taxpayer wealth unconnected to the dealing. *Thomas v. United States* upheld a stamp tax on the sale of stock as "contingent on the happening of the event of sale." 192 U.S. 363, 371 (1904). In dicta, the Court enumerated other economic activities that may be taxed: "importation, consumption, manufacture, and sale of certain commodities, privileges, particular business transactions, vocations, occupations, and the like." *Id.* at 370. Likewise, in *Flint v. Stone Tracy Co.*, the Court upheld a tax contingent on operating a "business in a certain way," and observed that there were "substantial differences between the mere ownership of property and the actual

doing of business in a certain way." 220 U.S. 107, 150 (1911).[1] This case, however, involves "mere ownership of property" and no taxable activity.

The government erroneously cites *Sebelius* for the proposition that taxation on foregoing an activity is constitutional without regard to realization. Opp. 18 ("Just as Congress may impose a tax based on foregoing health insurance, it may also impose a tax based on foregoing U.S. citizenship."). The ACA tax, however, applies based on "earning a certain amount of income" and does not require recognizing additional unrealized income. 567 U.S. at 571. *Sebelius* does *not* permit taxing conduct alone where there is no realized income.

The government lists cases that tax "events or activities" that necessarily involve *transfers* of property and that tax the property being transferred, in sharp contrast to expatriation, where the taxpayer's property is not transferred at all. In particular, the government asks the Court to draw a faulty analogy when it claims that death is a taxable "event." Opp. 18. Death entails a quintessential *transfer* of the decedent's property: before death, the decedent owns property, and after death, he owns nothing. The Supreme Court recognized as much, holding that the estate tax is constitutional because it "relate[s] not to property *eo nominee*, but … 'is predicated on the passing of property as the result of death.'" *Knowlton*, 178 U.S. at 47; *see also United States v. Mfrs. Nat. Bank of Detroit*, 363 U.S. 194, 198 (1960) (explaining in context of life insurance proceeds that "[i]f there is any taxable event here which can fairly be said to be a 'transfer' … the tax is clearly constitutional without apportionment," and that death effected such a "disposition").

---

[1] *See also Patton v. Brady*, 184 U.S. 608, 623 (1902) (taxing tobacco "held for sale [by dealer]"). A 1796 case on taxing the use of carriages has no legal relevance to the case at hand because it was premised on prior law that "direct taxes … are only two, to wit, a capitation … and a tax on land" excluding personal property. *Hylton v. United States*, 3 U.S. 171, 175 (1796). *Hylton* has been limited to its facts by *Pollock v. Farmers' Loan & Tr. Co.*, 158 U.S. 601, 637 (1895) (holding that direct taxes include taxes on personal property); *Brushaber*, 240 U.S. at 19 (noting that Pollock's holding that direct taxes include those on personal property survived the enactment of the Sixteenth Amendment).

DEFENDANT ROGER K. VER'S REPLY IN SUPPORT OF MOTION TO DISMISS
NO. 2:24-CR-00103-MWF

b.    *Expatriation Does Not Involve a Transfer of Property*

In contrast with death, no transfer or disposition occurs upon expatriation. The government weakly insists otherwise by fabricating a legal fiction, deeming expatriation the "death" of Ver-the-Citizen and concomitant "birth" of Ver-the-Noncitizen, who the government posits is a separate individual "inheriting" the wealth of his deceased Citizen doppelganger. This may be creative fabrication, but it is fabrication nonetheless—one that the government could deploy to circumvent the Sixteenth Amendment at will (*e.g.*, the "death" of the economy-class passenger and the "birth" of the first-class passenger).

*Cottage Saving Ass'n v. Comm'r* does not rescue the government, for the Court there merely held that a like-kind exchange was a disposition of property and therefore a realization event. 499 U.S. 554-55, 562, 565 (1991). There is no like-kind exchange here. *Cottage Saving* is inapposite because Ver's ownership of bitcoin was not transmuted by his expatriation into ownership of a different property: the bitcoin remained the same bitcoin. Due to this disconnect, the government compares expatriation to corporate reorganization cases cited by *Cottage Saving*. *See* Opp. 22-23. But the corporate reorganization cases are not on point because Ver's expatriation did not change his legal relationship to his bitcoin: ownership of bitcoin is recognized internationally. In fact, Ver and his bitcoin were in Japan pre- and post-expatriation, so there was no jurisdictional change in Ver's ownership rights at all. Ver's expatriation and the corresponding status shift of his corporations from S-corp to C-corp status—a tax election—did not alter his ownership of the companies or his indirect ownership of their bitcoin.

The government argues that because Ver's expatriation changed his relationship to the U.S. government, his relationship to his property is changed. Not so: Ver owned his bitcoin on March 2, 2014 and March 3, 2014. Indeed, that is an element of the government's case. *See, e.g.*, Opp. 19 (arguing that "when a citizen expatriates … his assets follow him").

DEFENDANT ROGER K. VER'S REPLY IN SUPPORT OF MOTION TO DISMISS
NO. 2:24-CR-00103-MWF

The government suggests that the change in ability to tax property after expatriation is a relevant change, as if expatriation necessarily entails a transfer of property out of the government's reach. Opp. 19. Not so. Expatriation is not a transfer of the expatriate's assets out of the country. Ver and his bitcoin were outside the United States long before he expatriated. And any change in the government's ability to tax the bitcoin after expatriation is a problem of Congress's own making: Congress could choose in § 877A to tax an expatriate's post-expatriation sale of assets, as it does in § 877. There is no necessary connection between an individual's loss of U.S. citizenship and any change in the government's power to tax dispositions of his property. The exit tax cannot be justified by the transfer of property because no such transfer occurs during expatriation.

### c.   The Exit Tax Is Not an Income Tax
#### (1) Supreme Court Precedent Imposes a Realization Requirement

The government argues that the exit tax can be construed as an income tax, even though it is patently a tax on personal property, and there is no realization of income. After a conclusory remark, the government jumps to realization, putting great weight on the Ninth Circuit's opinion in *Moore*, rather than the Supreme Court's decision. Opp. 20. Setting aside that the cited portion of the opinion was dicta, *see* Mot. to Dismiss ("MTD") at 16 n.10, the Supreme Court's determination that income was realized supplanted the foundation of the Ninth Circuit's opinion, rendering its remarks unnecessary. *Moore*, 602 U.S. at 584.[2] The Supreme Court has long instructed courts not to defer to "general expressions, [which] in every opinion, are to be taken in connection with the case … [and] ought not to control the judgment

---

[2] The majority in *Moore* found that income had been realized—not that realization is unnecessary. Although the government cites Justice Jackson's concurring opinion, the majority declined to find unrealized income can be taxed. If a majority of the Court believed that unrealized income can be taxed, the majority opinion would simply have said so.

DEFENDANT ROGER K. VER'S REPLY IN SUPPORT OF MOTION TO DISMISS
NO. 2:24-CR-00103-MWF

1  in a subsequent suit when the very point is presented for decision." *Cohens v. State*
2  *of Virginia*, 19 U.S. 264, 399 (1821).

3       *Macomber* remains the governing Supreme Court authority on realization as
4  a constitutional requirement, and its holding can only be overturned by the Supreme
5  Court, which has repeatedly refused to do so. *See, e.g.*, *Moore*, 602 U.S. at 598;
6  *Helvering v. Griffiths*, 318 U.S. 371, 394 (1943); Alex Zhang, *Rethinking Eisner v.*
7  *Macomber*, 92 G.W. L. Rev. 179, 185, 225 (2024) ("[T]he Supreme Court has never
8  overruled … *Macomber*" and "could easily dismiss as dicta" the criticisms cited by
9  the government). Given this precedent and the specific circumstances of *Moore*, the
10 Ninth Circuit's comments about realization in *Moore* were dicta, and to the extent
11 they were anything more, limited to their facts by the Supreme Court's rulings in
12 *Moore* and *Macomber*. Either way, the Ninth Circuit's dicta about realization are not
13 controlling here.

14                      *(2)The Government's Statutory Examples Are Consonant*
15                        *with* Macomber

16      The government misses the mark with its examples of taxes that purportedly
17 do not require realization. Taxes levied on corporations (*e.g.*, 26 U.S.C. §§ 475,
18 817A(b)) are excise taxes, not income taxes. *Flint,* 220 U.S. 107. Income realized
19 by a closely held corporation may be taxed at the shareholder level because it has
20 been realized by the corporation. *Moore*, 602 U.S. 572, 589–90 (2024). 26 U.S.C.
21 §§ 1256(a)-(b), 1259, 1272(a)(1), and 467(a) involve constructive receipt of income,
22 long held to be a realization event. *E.g.*, *Murphy v. United States,* 992 F.2d 929, 931
23 (9th Cir. 1993); *see also Diedrich v. Comm'r*, 457 U.S. 191, 196 (1982). 26 U.S.C.
24 § 1296(a) allows an annual mark-to-market calculation only based on a foreign
25 investment company regime that is predicated on realized income. None of that is
26 true of the exit tax, which is therefore subject to the Sixteenth Amendment's
27 realization requirement.

28

(3) *The "Deferral" Provision Does Not Save the Tax*

The government insinuates that the exit tax actually *does* satisfy the realization requirement because § 877A(b) permits the taxpayer to "elect[]" to "defer" "the time for payment" of the tax until the property is disposed of—and disposal of property is "a quintessential realization event." Opp. 24. This is a red herring. The exit tax is based on *the value of the property at the time of expatriation*. Even if the taxpayer can defer *payment* of that tax until he ultimately disposes of the property, that does not transform the tax into a constitutional tax *on the income realized from that disposition*. As one example, if a person buys a baseball card for $1 and expatriates when it is worth $100, the $99 gain at the instant of expatriation is "baked in" for tax purposes. Even if the person defers paying the tax until he later sells the card, he will owe tax on that never-realized paper gain of $99 even if the market for the card crashes in the meantime and he is forced to sell for $2, or even at a loss. Regardless of timing, the exit tax is unconstitutional because it purports to tax unrealized, imaginary income.

**2.    The Exit Tax Is an Unconstitutional Burden on the Fundamental Right to Expatriate**

The exit tax is an unconstitutional burden on the fundamental right to expatriate. *See* MTD § III.A.4. The government lodges three contrary arguments, but each lacks merit.

*a.    The Exit Tax Burdens the Right to Expatriate*

The government argues that the exit tax is constitutional because it "only burdens a small subset" of expatriates who qualify as "high-net-worth or high-income individuals." Opp. 24. But every American has a right to expatriate, and conditioning that right on a massive tax that may never be applied to similarly situated individuals remaining in the United States imposes a substantial burden on the exercise of that right.

8

Importantly, the exit tax does not make expatriation merely "tax-neutral." Consider again the person who buys a baseball card for $1 and, years later, sells it for $2. If he remained a U.S. citizen, he would owe tax on the realized income of $1. But if he expatriated when the card had a temporary market value of $100, then he would owe tax on that never-realized $99 gain, even though his *actual* gain would still be just $1. And while a tax on $99 might not be a *substantial* burden, the tens of millions of dollars that the government says Ver should have paid surely would be.

### b.    The Right to Expatriate Is Fundamental

Unbelievably, and contrary to U.S. Attorney General opinions, the government argues that Americans do not have a fundamental right to expatriate,[3] asserting the anachronistic English doctrine of "perpetual allegiance." But that feudal doctrine has never been the law of the United States.

The doctrine of "perpetual allegiance" was the notion that an individual was tethered to "the soil on which he lived," and that allegiance to one's liege lord was "permanent and indissoluble." *See, e.g.*, *United States v. Wong Kim Ark*, 169 U.S. 649, 707 (1898) (Harlan, J., dissenting). The Declaration of Independence repudiated that notion. *See* Opinion of Attorney Gen. Cushing, 8 U.S. Op. Atty. Gen. 139, 166 (Oct. 31, 1856) ("The doctrine of absolute and perpetual allegiance … is inadmissible in the United States. It was a matter involved in, and settled for us by, the Revolution, which founded the American Union."). The right to expatriate is "a part of the fundamental public law of the United States." *Id.*; *see also* James H. Kettner, *The Development of American Citizenship* 1608-1870, at 268-70 (1978) (the right to alter one's citizenship by expatriation has long been recognized as an "inherent and fundamental right."). In short, as Attorney General Jeremiah Black

---

[3] To be clear, Ver is not arguing that there is a fundamental right "to expatriate tax-free." Opp. 24. He is arguing that there is a fundamental right to expatriate and that the exit tax unconstitutionally burdens the exercise of that right.

DEFENDANT ROGER K. VER'S REPLY IN SUPPORT OF MOTION TO DISMISS
NO. 2:24-CR-00103-MWF

explained in 1859, while English common law and several U.S. courts "misled by British authority" embraced the doctrine of perpetual allegiance, most writers on public law "opposed the doctrine of perpetual allegiance." Opinion of Attorney Gen. Black, 9 U.S. Op. Atty. Gen. 356, 358 (July 4, 1859) (noting that we owe "our existence as a nation" to the right to expatriate).[4]

In 1868, Congress proclaimed that the right to expatriate is "a natural and inherent right of all people." *Savorgnan v. United States*, 338 U.S. 491, 497-98 & n.11 (1950) (quoting Preamble to the Act of July 27, 1868, ch. 249, 15 Stat. 223). The Ninth Circuit has likewise recognized the "constitutional right of voluntary expatriation." *Richards v. Sec'y of State*, 752 F.2d 1413, 1422 (9th Cir. 1985). The government's startling argument that the Constitution contains no right to expatriate, and that the Federal Government could therefore imitate the feudal lords of Europe by tying American citizens irrevocably to American soil, is both troubling and wrong.

The government also argues that there is no constitutional limit to the burden that Congress may place on fundamental rights through taxation, quoting the Supreme Court's statement in *Brushaber* that the Due Process Clause "is not a limitation upon the taxing power." Opp. 29. But *Brushaber* was not addressing burdens on fundamental rights. To the contrary, it was issued decades before the notion of rights implicit in the concept of ordered liberty (*i.e.*, fundamental rights) arose. *See Palko v. Connecticut*, 302 U.S. 319 (1937); *see also Speiser v. Randall*,

---

[4] *See, e.g.*, *Alsberry v. Hawkins*, 39 Ky. 177, 178 (1839) ("The right of an American citizen to emigrate, and renounce his allegiance to the government of the Union and of his State, is universally conceded."); *Murray v. McCarty*, 16 Va. 393, 396-97 (1811) ("[T]his right of emigration, or expatriation, is one of those 'inherent rights'"); *see also Talbot v. Jansen*, 3 U.S. 133, 162 (1795) (Iredell, J.) ("most nations in the world appear clearly to recognize" the right to expatriate). While Ver's opening brief inadvertently cited counsel's argument in *Murray v. Schooner Charming Betsy*, 6 U.S. 64 (1804), Chief Justice Marshall's opinion is clear that an American citizen may "place[] him[self] out of the protection of the United States." 6 U.S. at 120.

DEFENDANT ROGER K. VER'S REPLY IN SUPPORT OF MOTION TO DISMISS
NO. 2:24-CR-00103-MWF

357 U.S. 513, 522 (1958). *Brushaber*'s reference to the Due Process Clause is not plausibly read to refer to those fundamental rights that the Court was, decades later, to find implicit in that clause.

### c.    The Exit Tax Does Not Withstand Any Level of Scrutiny

The exit tax was not enacted in furtherance of "[m]aintaining a sound tax system," Opp. 29, or to avoid "incentiviz[ing] U.S. citizens to expatriate to evade their U.S. taxes," Opp. 29-30, and it is not tailored (narrowly or otherwise) to those interests. At best, the government could argue that the exit tax was enacted to deter tax avoidance (not evasion). But there is no legitimate government purpose in seeking to deter Americans from reducing their U.S. tax bills through the lawful exercise of their fundamental rights. The predecessor to the modern exit tax demonstrated what a tailored approach to preventing tax avoidance could look like. Until 2004, the Internal Revenue Code imposed a tax on those people who expatriated with a "principal purpose" of tax avoidance. *E.g.*, 26 U.S.C. § 877(a) (1999). Nonetheless, Congress was under pressure to make expatriating costlier. The result were amendments doing away with the limitation to expatriates motivated by tax avoidance and instead sweeping in all high-income or high-net-worth expatriates regardless of intent. In amending the exit tax, Congress removed the nexus to tax avoidance, making clear that its purpose was not preventing tax avoidance.

The result is both under- and over-inclusive. Expatriates who seek to avoid U.S. taxes may do so as long as they are not sufficiently wealthy. Expatriates who have no intent to avoid U.S. taxes and have been living outside the United States for years are subjected to massive taxes on hypothetical transactions that never occurred and may never occur. Congress could have mandated a tax on property when it is sold (*e.g.*, § 877(a))—but Congress did not do so here. The exit tax, as amended, does not withstand scrutiny.

Even if the law did withstand scrutiny on its face (it does not), it would be unconstitutional as applied to the facts of this case. Even the Joint Committee on

DEFENDANT ROGER K. VER'S REPLY IN SUPPORT OF MOTION TO DISMISS
NO. 2:24-CR-00103-MWF

Taxation Staff conceded that applying the exit tax to "the present value of a *possible* future distribution that the beneficiary may or may not ever receive," might be unconstitutional. J. Comm. on Taxation, *Issues Presented by Proposals to Modify the Tax Treatment of Expatriation* 84 (June 1, 1995). Although the Staff was considering contingent interests, ownership of bitcoin in March 2014 was equivalent to a contingent interest. After Mt. Gox collapsed earlier in 2014, there was no guarantee or even likelihood that Ver would ever receive income from the bitcoins. "In such a case, the individual who wishes to renounce his citizenship may be subjected to the punitive choice of relinquishing his [interest in the bitcoins] or paying a potentially significant tax on what could be viewed as 'phantom income.'" *Id.* (noting that this application "could be viewed as irrational and, thus, a theoretical 'taking' in violation of the due process clause"). The exit tax violates the Fifth Amendment as applied.

**B.    The Indictment Rests on Impermissibly Vague Legal Foundations**

In response to Ver's argument regarding the vagueness of the Tax Code's provisions as applied to digital assets, the government pretends that it has charged a different crime. No law or regulation required Ver to disclose the number of bitcoins he held at the time of his expatriation. The laws that the government cites as models of "clarity" required that expatriating citizens pay appropriate taxes on hypothetically liquidated property deemed "sold" the day before expatriation. Rather than acknowledging that this requirement was (and remains) inscrutable as to the hypothetical sale of bitcoin on March 2, 2014, the government pretends instead that Ver should have disclosed the amount of that property in his possession (itself an impossible task, as discussed in MTD § II), rather than pay whatever appropriate taxes resulted from that hypothetical sale. But the government cannot rewrite the indictment or the law to excuse the Tax Code's lack of constitutionally required guidance.

The government's attempt to overcome the Tax Code's vagaries as applied to digital assets demonstrates the vagueness that is fatal to the charges against Ver. The government goes to great lengths to recast the exit tax as a kind of asset declaration rule, rather than what it purports to be: a rule requiring the payment of taxes based on the hypothetical liquidation of property. The problem that the government simply ignores—understandably, as the Tax Code provides no guidance on this point—is that there is no ground in the Tax Code to understand *how* that liquidation is to apply to digital assets when selling any substantial portion of them would have crashed the price. The government makes the point repeatedly that bitcoin is property of *some kind* and, as such, subject to § 877A. *See* Opp. 33-34. The government makes no effort, however, to state the *kind* of property *or the relevant tax implications for a hypothetical sale* as of 2014. This is unsurprising: there was no clarity regarding the manner of accounting or valuation for the kinds of assets at issue in this case. Nor does the IRS's unfounded "notice" provide any relevant guidance. Indeed, even despite Notice 2014-21, the government appears equally confounded with its own indictment, failing to identify the nature of Ver's bitcoin, the bitcoin's value accounting for a one-day fire-sale at multiples of the worldwide bitcoin daily trading volume on March 2, 2014, or the amount of exit tax purportedly still owed by Ver (given the millions he undisputedly paid).[5]

Similarly, the government attempts to rewrite its charges through a new assertion that it is *not* Form 8854—the IRS exit tax reporting form—that formed the basis for the charges against Ver, contrary to the language of the indictment. *See* Opp. 34-35. As the government knows, Form 8854 requires the disclosure of

---

[5] The government says that it has accused Ver of failing to pay $48 million in taxes, Opp. 7 n.5, but it refuses to say what portion of this total constituted an exit tax and on what basis. The government alleges bitcoin worth $102.4 million "absent discounts," Opp. 1, but stops short of asserting that there should have been no discounts. Common sense dictates that if only 2% of an asset can be sold, then that asset's fair market sale value is (at most) 2% of what it would be if the entire asset could be sold.

13

DEFENDANT ROGER K. VER'S REPLY IN SUPPORT OF MOTION TO DISMISS
NO. 2:24-CR-00103-MWF

"income tax liability," as well as a list of fair market value and adjusted basis for various asset categories. *See* Form 8854, *available at* https://www.irs.gov/pub/irs-pdf/f8854.pdf (last visited Jan. 27, 2025). The indictment alleges that Ver's Form 8854 was false. *See* Ind. ¶¶ 14-15, 18-19, 27(g)-(h), 28 (Counts One and Two), 30(b). As the government also knows, the IRS has never issued regulations under § 877A, and at least one court has found that Form 8854 is itself an unlawfully issued IRS form based on a failure to comply with the Administrative Procedure Act. *Aroeste v. United States*, No. 22-cv-00682, 2023 WL 8103149, at *6 (S.D. Cal. Nov. 20, 2023). The lack of meaningful guidance regarding how an expatriating filer could report the value of digital assets where no market existed for the disposition of large volumes placed people like Ver in an untenable situation. That the government runs away from its own allegations is fatal to its case and is an indication that it, too, cannot ascertain Ver's actual obligations.[6]

Nor does the government's citation to cases in which the underlying offense *was* clear suggest that requiring a scienter element saves their case. In *Kawashima v. Holder*, for example, the Court made no reference to vagueness and instead found that the word "deceit" was clear based on its common usage and readily identifiable dictionary definition. 565 U.S. 478, 484 (2012). In *United States v. Fisher*, the Ninth Circuit reviewed a District Court's refusal to include a "lesser offense" instruction in a tax-related matter, where "willfulness" was among the elements of the offense; the opinion does not discuss vagueness or say that a willfulness requirement can save an otherwise unconstitutionally vague law. 607 F. App'x 645 (9th Cir. 2015). *United States v. Jinian* posed the question of whether certain wire transactions were conducted during and as an integral part of the charged scheme. 725 F.3d 954 (9th

---

[6] Indeed, the instructions for Form 8854 state: "You can use good-faith estimates of FMV and basis. Formal appraisals are not required." After nearly a decade, the government *still* will not assert the true value of Ver's bitcoins, apparently finding a good-faith estimate to be either inconvenient or impossible to provide.

DEFENDANT ROGER K. VER'S REPLY IN SUPPORT OF MOTION TO DISMISS
NO. 2:24-CR-00103-MWF

1  Cir. 2013). *Jinian* involved no discussion of vagueness or the impact of a scienter
2  element. Together, these citations stand for the fact that Congress is able to draft
3  criminal statutes that include a scienter element. None comes close to holding that
4  the inclusion of such an element necessarily saves an otherwise unconstitutional
5  statute.

6      Nor is the Supreme Court's dictum in *McFadden v. United States* sufficient
7  to save an unconstitutionally vague law. *McFadden* dealt with a defendant who
8  claimed that the knowledge requirement of the Controlled Substances Act and the
9  Analogue Act "can only be established by knowledge of the characteristics that make
10  a substance an 'analogue' under the Act." 576 U.S. 186, 196 (2015). The Supreme
11  Court rejected that interpretation, holding that a defendant need only know that a
12  substance is "controlled," *i.e.*, "either by knowledge that a substance is listed or
13  treated as listed by operation of the Analogue Act … or by knowledge of the physical
14  characteristics that give rise to that treatment." *Id.* McFadden argued that the Court's
15  interpretation would render the statute unconstitutionally vague and urged the use of
16  an interpretive cannon to avoid reading the statute in a purportedly unconstitutional
17  manner. *Id.* at 196-97. Critically, McFadden's argument regarding the alternative
18  interpretations did not actually describe any portion of the statute that might, under
19  any reading or any precedent, be considered vague. *Id.* at 197. Rather, McFadden
20  argued that *imposing* a knowledge requirement on the inarguably clear language of
21  the Acts would somehow render them "vague" in the sense that they would require
22  knowledge of something very specific and perhaps difficult to know. *See id.* at 196–
23  97. The Court rejected that argument precisely because the statute *required*
24  knowledge of the fact that might be difficult to know, mooting McFadden's
25  purported "vagueness" argument. *Id. McFadden* certainly does not stand for the
26  proposition that a vague statute is saved merely by including as an element that a
27  person "knowingly" performs some undefined and contentless act, as the
28  government would have it here. *McFadden* does not overturn the principle that

"willful conduct cannot make definite that which is undefined." *Screws v. United States*, 325 U.S. 91, 105 (1945).

As the government's continued failure to allege or identify the manner in which Ver's Form 8854 purportedly violated the Tax Code makes plain, the Code's rules and regulations as applied to bitcoin in 2014 provided no "guidelines to govern law enforcement," *Kolender v. Lawson*, 461 U.S. 352, 358 (1983), and provided nothing like "fair warning about what the law demand[ed]." *United States v. Davis*, 588 U.S. 445, 448 (2019).

### C.     The Government's Selective Quotation and Disregard of Exculpatory Evidence Warrants Dismissal

The government's selective quotation and suppression of exculpatory evidence deprived Ver of the right to a "grand jury of autonomous and unbiased judgment," which merits dismissal. MTD at 28 (quoting *United States v. Al Mudarris*, 695 F.2d 1182, 1184-85 (9th Cir. 1983)). The government does not deny that the exhibits underlying the indictment state that (1) Ver knew he would be audited and emphasized the need for compliance; (2) expert advisors told Ver that for exit tax purposes, the fair market value of bitcoin assets meant the value he could obtain in a pretend one-day sale, not the spot price of a single unit; and (3) Ver tried in good faith to comply with his advisors' guidance and answer their questions, but doing so was often impossible due to lack of data regarding who owned which bitcoin. Instead of disputing these facts, the government makes two meritless arguments.

#### 1.     The Exhibits Underlying the Indictment Were Exculpatory

The government halfheartedly argues that "Ver's exhibits only demonstrate the[] accuracy [of the indictment's allegations]." Opp. 37. The government is wrong. Ver's opening brief focused on three examples of evidence that preclude any conclusion of intent to defraud. To each, the government responds with sleight of hand and pedantry—for example, arguing that two emails in the same email chain

---

16

are not part of the same "conversation." *See* Opp. 37. When it comes to substance, however, the government is silent.

The government's case theory is that Ver should have known that his companies were undervalued when he submitted his 2014 tax returns because his advisors told him that he was "legally required" to use the spot price of bitcoin (approximately $800) as the fair market value. Opp. 4-5; Ind. ¶ 27.e.vi. If Ver was required to use the spot price of bitcoin, then the company valuations would have looked too low. *See* Opp. 5 (summarizing email in which lay-witness unfamiliar with discount requirement reaches this opinion). But that is not what Ver's advisors told him.

As the statute makes clear and his advisors told him, Ver was required to use the fair value he could have obtained if the property was "sold on the day before the expatriation date," not the spot price. 26 U.S.C. § 877A(a); *see, e.g.*, *United States v. Cartwright*, 411 U.S. 546, 551 (1973) (striking down estate tax valuation regulation as "unreasonable and unrealistic" estimate of "the price the estate could have obtained if it had sold the [property] on the valuation date"). Because Ver had enough bitcoins to overwhelm the market and crash the price, he was not required to use the spot price, and instead, the value should reflect the inability to sell the asset. Ex. 4 (Dkt. 21-4). The fact that Appraiser 2's company valuations diverged from the spot price was therefore of no moment: Ver knew that the spot price was not the way to determine his holdings' value. There was no basis to disregard the independent valuation completed by Appraiser 2 and reviewed without objection by accountants and lawyers advising Ver.

The government's response makes no sense: "[t]he fact that the advice Ver received from his advisors changed over time does not render the indictment's allegation either incomplete or inaccurate." Opp. 38. To the contrary, when an advisor corrects erroneous advice, that *does* reflect that the earlier advice was both incomplete and inaccurate. *Cf. In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1083–

84 (N.D. Cal. 2001) ("[T]he mere fact that the statements were restated at all supports … an inference" that the original statements were false). The government—by causing the grand jury to rely on that incomplete and inaccurate statement[7]—undermined the grand jury's independent judgment and impartiality.

Ver and his advisors openly discussed the fact that the bitcoin market was illiquid and shared market depth information that would facilitate the hypothetical one-day sale amount for bitcoin. While the indictment paints Ver's answers as evasive or non-responsive, the context makes clear that they were in fact responsive and good-faith attempts to share the information related to the maximum amount that a single seller could obtain for their bitcoin in a single day (and thus, the maximum value that such bitcoin could have under a hypothetical one-day sale regime).

Presented in context, these and other communications exculpate Ver. He was asked to do the impossible: to value assets that could not be sold for more than nominal amounts in a fire-sale, and then to guess at how many of those assets were owned by his companies and how many he owned himself. Ver attempted to work with his advisors to find an accurate way to calculate and pay taxes upon the maximum bitcoin sale one could accomplish in March 2014. Ver believed that by doing so, he was complying with the law.

In its Opposition, the government again misrepresents the exculpatory contents of key documents—this time, Exhibit 14 (Dkt. 21-14). Exhibit 14 shows that as Law Firm 1 was assisting with the wind-down of MemoryDealers and Agilestar and preparing Ver's corresponding 2017 tax return, Ver informed Law Firm 1 that he had made substantial trades on U.S. cryptocurrency exchanges, *i.e.*,

---

[7] A different section of the exculpatory email is cited in Ind. ¶ 27.e.xvii. *See* Opp. 38. This does not, however, prove that "the grand jury [did or] did not review the email." *Id.* Based on the inaccurate citation to disclaimed advice, it is likely that the grand jury received only an agent's misleading summary of the email.

DEFENDANT ROGER K. VER'S REPLY IN SUPPORT OF MOTION TO DISMISS
NO. 2:24-CR-00103-MWF

selling bitcoin owned by MemoryDealers U.S. and Agilestar. Law Firm 1 advised Ver that the resulting profits were not taxable because bitcoin was intangible property, and the resulting gain was therefore not U.S. income. Law Firm 1, despite knowing that Ver's U.S. bitcoins were owned by MemoryDealers U.S. and Agilestar, did not advise him that the transfer upon shutdown would constitute a distribution and instead told Ver it did not need further detail on the transactions.

The government bizarrely asserts that this conversation took place "later," and that Law Firm 1's knowledge that the U.S. companies' bitcoins had been sold was "irrelevant." Opp. 7 n.4. The government is wrong. Law Firm 1 knew that Ver's companies had dissolved and that Ver had sold bitcoin they owned. Based on Law Firm 1's advice that the resulting proceeds were not taxable, it is utterly incomprehensible that Ver would or could have figured out that his lawyers were supposedly wrong,[8] and urged them to report a transaction that he had no way to know was taxable by the U.S. government. The government knows that the documentary evidence disproves the allegations of tax evasion, and its Opposition chooses to obscure the contents of that evidence once again. It shocks the conscience that the government would engage in these tactics, and this provides an additional basis on which to dismiss the indictment.

## 2.    The Government Was Not Entitled to Mislead the Grand Jury Regarding the Exhibits' Content

The government's other argument is that even though the exhibits underlying the indictment were exculpatory, the prosecution is free to hide exculpatory evidence from the grand jury. Opp. 38. But it cannot be the case that the government is free to mislead grand jurors about critical communications between a defendant and his lawyer while hiding the exculpatory contents of the actual communications. *See United States v. Red Elk*, 955 F. Supp. 1170, 1182 (D.S.D. 1997) ("[A] prosecutor

---

[8] A taxpayer is entitled to rely on an attorney's advice and is not required to challenge it. *United States v. Boyle*, 469 U.S. 241, 251 (1985).

DEFENDANT ROGER K. VER'S REPLY IN SUPPORT OF MOTION TO DISMISS
NO. 2:24-CR-00103-MWF

1    may not deliberately mislead a grand jury or instill false impressions to it in an effort

2    to obtain an indictment.") (citing *United States v. De Rosa*, 783 F.2d 1401, 1404-07

3    (9th Cir. 1986)).

4         Allowing prosecutors to misrepresent the contents of the communications

5    between Ver and his lawyers undermined the grand jury's very purpose: to serve as

6    a bulwark between the prosecution and the accused. *See Wood v. Georgia*, 370 U.S.

7    375, 390 (1962) (grand jury's role is to "stand[] between the accuser and the

8    accused" and protect the innocent against "hasty, malicious and oppressive

9    persecution"); *Stirone v. United States*, 361 U.S. 212, 218 (1960) (grand jury's

10   purpose to limit defendants' jeopardy to those charges approved by a body "acting

11   independently of either prosecuting attorney or judge"); *Ex parte Bain*, 121 U.S. 1,

12   11 (1887) (grand jury is "means of protecting the citizen against unfounded

13   accusation") The grand jury's ability to defend the accused requires that "limits must

14   be set on the manipulation of grand juries by overzealous prosecutors." *Al Mudarris*,

15   695 F.2d at 1185 (quoting *United States v. Samango*, 607 F.2d 877, 882 (9th Cir.

16   1979)). The Court may exercise its supervisory power to dismiss an indictment

17   where "the grand jury's function has been so subverted as to compromise the

18   integrity of the judicial process." *Id.* (citation omitted).

19        A grand jury cannot fulfill its duty to defend the accused if it is precluded

20   from reviewing the evidence. In *Samango*, the prosecutors called an agent to testify

21   about the witness statements that formed the basis for an indictment. 607 F.2d at

22   879. In fact, the agent's version of those statements was disputed and relied on

23   dubious speakers. Rather than disclose that exculpatory information to the grand

24   jury, however, the prosecutors relied on agent testimony that avoided disclosing that

25   the agent's version of events was unreliable. *See id.* at 879-881. The district court

26   dismissed the indictment, and the Ninth Circuit affirmed, reasoning that "a line must

27   be drawn beyond which a prosecutor's control over a cooperative grand jury may

28

DEFENDANT ROGER K. VER'S REPLY IN SUPPORT OF MOTION TO DISMISS
NO. 2:24-CR-00103-MWF

not extend." *Id.* at 882 (noting that introduction of perjured testimony can cause improper influence and usurpation of the grand jury's role).

So too here. It is clear from the indictment and the Opposition that the grand jury did not review the exculpatory contents of the exhibits cited in the indictment.[9] Had the grand jury been permitted to evaluate the exhibits underlying the indictment with independent judgment and impartiality, it would not have returned the indictment. That merits dismissal.

## III.    VER IS NEITHER A FUGITIVE NOR SUBJECT TO DISENTITLEMENT

The government asks the Court to apply the fugitive disentitlement doctrine, but the doctrine applies only if (A) Ver is a fugitive *and* (B) disentitling Ver would serve the doctrine's objectives. *United States v. Bescond*, 24 F.4th 759, 771 (2d Cir. 2021). Neither prerequisite is met here.

### A.    Ver Is Not a Fugitive

Fugitive disentitlement is a "severe sanction that [courts] do not lightly impose." *Antonio–Martinez v. INS*, 317 F.3d 1089, 1091 (9th Cir. 2003). A traditional fugitive is a person who "flees from the jurisdiction of the court where a crime was committed or departs from his usual place of abode and conceals himself." *Bescond*, 24 F.4th at 771. A constructive-flight fugitive is "a person who allegedly committed crimes while in the United States," then left the country and refused to return in order to avoid prosecution. *Id.* at 772. The refusal to return must be specifically motivated by the avoidance of prosecution and not merely residing outside of the United States for reasons unrelated to the prosecution. *See id.* (noting

---

[9] To the extent there is any doubt whether the grand jury reviewed the exhibits, *Samango* places the burden of proof with the government. *See id.* at 881 ("[T]he lengthy transcripts were merely deposited with the grand jury, and the record does not show how much time the jurors spent with the transcripts nor whether they read them at all.").

that the doctrine does not reach defendants "who stay[] at home abroad, without concealment or evasion"). Ver is neither type of fugitive. He was not in the United States at the time of the alleged crime nor at the time of indictment, and he has not lived in the United States since approximately 2006. Ver has not evaded or hidden from anyone and has lived and worked openly at all times.[10]

In short, he is not a fugitive, and the doctrine does not apply. *See also Brar v. Holder*, 336 F. App'x 631, 632 (9th Cir. 2009) ("The Fugitive Disentitlement Doctrine does not apply when, as here, there is no evidence that the [litigant] was in hiding or had fled to avoid [the proceeding]."); *United States v. Tucor Int'l, Inc.*, 35 F. Supp. 2d 1172, 1189 (N.D. Cal. 1998), *aff'd*, 189 F.3d 834 (9th Cir. 1999).

Because Ver has not fled and is not hiding, the government's argument is merely that he has not "report[ed] for prosecution." Opp. 11 (quoting *United States v. Martirossian*, 917 F.3d 883, 890 (6th Cir. 2019)). Contrary to *Martirossian*, however, no such duty exists. In the immigration context, the Ninth Circuit has repeatedly declined to apply the fugitive disentitlement doctrine to litigants who have neither hidden nor fled.[11]

*Martirossian* contains no reasoning for its contrary view; it merely cites *United States v. Shalhoub*, 855 F.3d 1255 (11th Cir. 2017), which merely cites *United States v. Barnette*, 129 F.3d 1179 (11th Cir. 1997). *Barnette* dealt with a defendant who had disappeared; it was unknown whether he was inside or outside the country. Under those circumstances, the court reasoned that, "*by hiding*, he ha[d] refused to surrender himself to the jurisdiction of th[e] court. So, he is, for the law's

---

[10] Indeed, at the time of his arrest, Ver was traveling to attend cryptocurrency conferences on behalf of Saint Kitts. Ver's defense team is in the process of obtaining additional documentation regarding Ver's status in Spain, and, if warranted, may file a separate motion to dismiss on this basis.

[11] *See Wenqin Sun v. Mukasey*, 555 F.3d 802, 804-805 (9th Cir. 2009) (declining to apply the fugitive disentitlement doctrine to an alien who failed to report for removal); *Gutierrez v. I.N.S.*, 201 F.3d 444, at *2 & n.2 (9th Cir. 1999) (declining to apply the fugitive disentitlement doctrine to an alien who failed to surrender for deportation); *see also Brar*, 336 F. App'x at 632.

22

DEFENDANT ROGER K. VER'S REPLY IN SUPPORT OF MOTION TO DISMISS
NO. 2:24-CR-00103-MWF

1    purposes, a fugitive from justice." *Id.* at 1184 (emphasis added). *Barnette* did not

2    consider the case of a defendant who has neither fled nor hidden. *Martirossian* and

3    *Shalhoub*'s statements are erroneous.

4        The Second Circuit's *Bescond* opinion explicitly considered and rejected

5    *Martirossian*, holding that "if the doctrine [is] to be expanded to reach [a foreign

6    national] … who stays at home abroad, without concealment or evasion, [it is up to]

7    "Congress, not the courts" to make such a law. *Id.* at 773 (fugitive disentitlement

8    doctrine does not apply to a French national who had not fled the United States after

9    an indictment); *accord In re Hijazi*, 589 F.3d 401, 412-14 (7th Cir. 2009) (fugitive

10    disentitlement doctrine does not apply to a defendant who did not flee). Just as

11    *Bescond* held that constructive flight is not satisfied by the mere continued absence

12    without flight or attempted concealment, 24 F.4th at 771-72, Judge Wu correctly

13    opined that "it is somewhat hard to understand why the Court should even conclude

14    that they fall within the *fugitive* disentitlement doctrine [where defendants] are not

15    United States citizens or residents" and did not leave the United States post-

16    indictment. *United States v. Siriwan*, No. 09-CR-00081, 2011 WL 13057709, at *1

17    (C.D. Cal. July 28, 2011).[12] As in *Bescond* and *Siriwan*, this Court should decline

18    the government's efforts to expand the fugitive disentitlement doctrine to people

19    who are not fugitives.

20        As in *Bescond*, Ver is not a U.S. citizen, does not reside in the United States,

21    did not flee, and is not evading the indictment.[13] Ver moved to Japan in 2006,

---

23    [12] *United States v. $671,160.00 in U.S. Currency*, 730 F.3d 1051, 1056 (9th Cir. 2013), which the
24    government cites, involves fugitive status based on a federal statute specific to asset forfeiture,
25    28 U.S.C. § 2466(a)(1)(B). As the Second Circuit explained in *Bescond*, § 2466(a)(1)(B) exists
      in context peculiar to asset forfeiture (preventing the individual from accessing the U.S. fruits of
      criminal activity, *see $671,160.00*, 730 F.3d at 1058) and does not apply outside that context. 24
26    F.4th at 772.

27    [13] The government argues that Ver "cease[d] traveling [to the United States]" after this
28    investigation was initiated. Opp. 13. That is a red herring. Whether Ver ceased traveling to the
      United States after he shuttered his U.S. businesses in 2017 is irrelevant to whether he is a

DEFENDANT ROGER K. VER'S REPLY IN SUPPORT OF MOTION TO DISMISS
NO. 2:24-CR-00103-MWF

intending to expatriate from the United States as soon as he could obtain citizenship in another country—long before the allegations in the indictment. After finally obtaining Saint Kitts citizenship, Ver expatriated in 2014. Ver has been living abroad for nearly two decades. With no obligation to appear before U.S. courts absent an extradition order, he is not a fugitive.

### B. Even If Ver Is a Fugitive, Disentitlement Is Unjustified

Even assuming that Ver was a "fugitive," disentitlement should not attach because it would not serve the purposes of the doctrine. *See Bescond*, 24 F.4th at 771 ("The court may then exercise discretion to disentitle the fugitive—but only if doing so would serve the doctrine's objectives."). Disentitlement serves four purposes: "1) assuring the enforceability of any decision that may be rendered against the fugitive; 2) imposing a penalty for flouting the judicial process; 3) discouraging flights from justice and promoting the efficient operation of the courts; and 4) avoiding prejudice to the other side caused by the defendant's escape." *Id.* at 773-74. The court considers the "countervailing prejudice" to the defendant: "[d]isentitlement enables the government to coerce [a defendant]'s presence in court by imposing financial, reputational, and family hardship regardless of her guilt or innocence." *Id.* at 775. Weighing these factors, disentitlement should not attach here.

---

constructive-flight fugitive. The government raised the same argument in *United States v. Cornelson*, where the Brazilian defendant owned a home in the United States, where he spent 119 days per year, until being deposed by the SEC and ceasing all travel outside of Brazil, where he was safe from extradition. 595 F. Supp. 3d 265, 269 (S.D.N.Y. 2022). The court rejected this argument because a defendant "ha[s] no obligation to enter the United States to face arrest." *Id.* at 271 ("Having been transparent about his plans to return to Brazil, and living there openly, it cannot be said that Mr. Cornelson is in a 'hideout, sanctuary, or escape from the reach of law.'" (quoting *Bescond*, 24 F.4th at 773)); *accord Hijazi*, 589 F.3d at 407 ("under no obligation to travel to the United States"); *Siriwan,* 2011 WL 13057709, at *1-2. Just as Cornelson had no obligation to enter the United States, nor does Ver. He is not obligated to continue visiting a country in which he no longer owns any businesses and from which he has expatriated. His failure to do so does not make him a fugitive.

DEFENDANT ROGER K. VER'S REPLY IN SUPPORT OF MOTION TO DISMISS
NO. 2:24-CR-00103-MWF

First, the motion to dismiss will not create an unenforceable judgment. If the motion is granted, Ver is no longer under indictment. If the motion is denied, the government will continue extradition.

Second, as in *Bescond*, Ver is not flouting the judicial process. He is a foreign national, entitled to remain outside the United States. *See supra* note 13 (collecting cases holding that defendants have "no legal obligation to travel to the United States" (quoting *Hijazi*, 589 F.3d at 407)). Ver did not flee Spain upon being released, and he presents legitimate constitutional challenges to the indictment.

Third, deciding this motion does not encourage flight or cause inefficiency in the operation of the courts. Ver has not fled or indicated any intent to flee. With respect to efficiency, it is disentitlement that would be inefficient. There is no reason to expend untold resources, time, and money litigating extradition on an indictment that is fatally flawed. The costly extradition process can be avoided if the Court grants Ver's motion to dismiss.

Lastly, the government is not prejudiced by this Court deciding Ver's motion to dismiss. Ver, however, is prejudiced by the Court refusing to decide his motion by continued "financial, reputational, and family hardship." *See Bescond*, 24 F.4th at 775. Ver remains separated from his family, held on an unlawful indictment and prohibited from leaving an island where he does not live. Delaying dismissal of Ver's case would prejudice him by continuing that separation. The Court should decline to apply the fugitive disentitlement doctrine, decide Ver's motion on the merits, and dismiss the indictment.

*[Signature page to follow]*

DEFENDANT ROGER K. VER'S REPLY IN SUPPORT OF MOTION TO DISMISS
NO. 2:24-CR-00103-MWF

Dated: January 27, 2025          Respectfully submitted,


                                 */s/ Ashwin J. Ram*
                                 Ashwin J. Ram (SBN: 277513)
                                 aram@steptoe.com
                                 633 West Fifth Street, Suite 1900
                                 Los Angeles, CA 90071
                                 +1 213 439 9400

                                 Andrew C. Adams (admitted *pro hac vice*)
                                 acadams@steptoe.com
                                 1114 6th Ave.
                                 New York, NY 10036
                                 +1 212 506 3900

                                 Nicholas P. Silverman (admitted *pro hac vice*)
                                 nsilverman@steptoe.com
                                 Galen C. Kast (admitted *pro hac vice*)
                                 gkast@steptoe.com
                                 1330 Connecticut Ave.
                                 Washington, DC 20026
                                 + 1 202 429 3000
                                 **Steptoe LLP**

                                 Darrell P. White (SBN: 270038)
                                 dwhite@klw-law.com
                                 17631 Fitch
                                 Irvine, CA 92614
                                 +1 949 474 0940
                                 **Kimura London & White LLP**

                                 *Attorneys for Defendant Roger Keith Ver*

1

## **L.R. 11-6.2 Certificate of Compliance**

2

3      The undersigned, counsel of record for Defendant Roger K. Ver certifies that

4    this brief contains 8,719 words, which complies with the word limit set by court

5    order dated January 27, 2025.

6

7    Dated: January 27, 2025        Respectfully submitted,

8                                */s/ Nicholas P. Silverman*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF COMPLIANCE
NO. 2:24-CR-00103-MWF